So as to the tandem case, Derogatis v. Board of Trustees of the pension on Mr. Libras. We'll hear from you. Thank you, Your Honor. May it please the Court. This second case concerns whether the Board of Trustees of the Central Pension Fund can be held responsible for what Richard Lopez, the Welfare Fund employee, told Emily Derogatis. First, with respect to responsibility, under the doctrine of apparent authority, first the district court in Derogatis I ruled that there were questions of fact and that denied the pension fund's motion, the trustee's motion for summary judgment on that score. The facts on apparent authority in this record are undisputed. What actually happened is undisputed. The only question is the legal significance of those facts. Here the record is undisputed that the pension fund, this was not a one-off incident where the pension fund just happened to send a benefit estimate to the local welfare fund to provide the participant coming in for discussion. This was a common occurrence at the pension fund. The testimony in the record of Mr. Marbury, the benefit supervisor at the pension fund, stated that it commonly happened that a member of a local or a welfare fund would call, state that a member was coming in to discuss retirement, and the pension fund would send the benefit estimate to the local or to the welfare fund person to have available to make sure that the member had all the information available to them about benefit rights should they retire. Under those circumstances, it's eminently reasonable. That creates the impression in the member. It's quite reasonable that the member, any member would think that the person speaking is speaking at the local or in the welfare fund is speaking on with the authority of the pension fund. The principle of apparent authority is that. Let's suppose that that's true. Yes. And that that might be true, and you'd have an interesting argument if Mr. Lopez had said, here's what the pension benefits are going to be, and he misstated that, and as a result of that, she made an erroneous decision or an imprudent decision. But isn't the problem here that whatever authority or apparent authority Mr. Lopez may have to speak for the pension fund about the pension plan, he didn't say anything about the pension plan that's relevant or that was inaccurate, that's relevant to our problem. She knew exactly what was the case under the pension plan. She had accurate information about that. It had been provided by Keegan or Keenan earlier. No one's contending that that was wrong, except insofar as you have this retroactivity argument, there's not really an issue about what the pension eligibility is and what the pension options are. The problem is that Mr. Lopez, an employee of the welfare fund, gives erroneous information about the welfare fund, and that leads Ms. DeRogatis to make an imprudent election about what kind of pension to apply for or whether to put in the retirement papers. But I'm having trouble understanding how the pension fund could be responsible for that. They authorized him to speak, perhaps. Let's assume they explicitly said, you can give advice about pension benefits. You're our guy. But he didn't do that. They didn't authorize him to speak about welfare benefits. They don't know anything about welfare benefits. They are the pension people. Why is his error about what he unquestionably has authority from a completely different principle to speak about affect the liability of the pension fund? Well, first, what he said was he warned her against filing the pension application, but he omitted to tell her that if you don't file the pension application before your husband dies, he's going to lose — that he has to — he can only provide if he files the application before he dies. But if that's the problem, if you're saying he gave implicitly misleading advice about the pension fund, then we have a more serious Becker problem because no one's contending that the pension plan was unclear about how the 50 percent benefit worked. Well, if — He was right about what the — Well, no, we — the section — the court, in our brief, we pointed out that section 10.03 of the pension plan. First of all, the plan summary, if the plan itself, the pension plan, does not allow benefit applications to be filed after a worker dies, if that's what the plan itself provides, the SPD does fairly — it does fairly say that. The question is whether the pension plan itself provides for that. And the pension plan itself has a two-step process that seems to require that first the participant elects a form of retirement and then a form of pension benefit. So even if it accepted the retirement application that Frank signed before he died, I don't understand how Emily could complete all the secondary steps that are set out in the form. The pension plan cannot require — in our reply brief, we pointed out the pension — ERISA requires them to provide a benefit in the form of a joint and survivor annuity. The pension plan itself inaccurately states that you have to elect a joint and survivor annuity. That's not right. It's a 50 percent joint and survivor annuity that's automatic. I'm sorry? What — Not under the plan but under the law? Under the law, the pension plan has to provide a — when a worker retires, a married participant is entitled by law — that's in 29 U.S.C. 1055 — to receive a benefit in the form of a joint and survivor annuity unless the spouse waives that in writing. That's the Retirement Equity Act amendments. Now, what happened here is that the pension plan was much broader than the ERISA minimum requires. It provided more options like a 100 percent that had to be elected. The benefit itself, when — if Lopez was — had the authority, if he was an agent of the pension plan and he told her not to file the pension application and he didn't give her the opportunity to understand that if you don't file it, you're going to — you can lose something, the pension fund can be on the hook and be — that would be a breach of duty. If that was so coercive that no reasonable person could have done anything but follow Lopez's instructions, if it's inherently coercive, then as — when the plan sponsor interferes with your filing the benefit application and here the benefit application had to come in first and then they sent out the estimate form, then you'd elect the estimate form and then send that back in. Because he — if it's so inherent — if it's so — so interferes with the filing of the benefit election form, he stopped the process and both the failure to file the election form and the application arise out of what Lopez told her and that therefore the argument is that should be — the failure to — the interference with the completion of the process results in that being excused. The filing of the — But that gives the trustees the authority to ignore the terms of the plan itself. No, it allows the court to excuse the filing of the benefit application. Filing the application is a condition precedent and the election form are conditions precedent to the obligation of the trustees to pay the benefit in the elected form. When the plan trustees or their representative interfere with that filing, under the Seventh Circuit's swayback decision, the filing is excused under the federal common law of ERISA and you don't even reach the issue of whether there's a fiduciary duty. The court may find that and order the trustees to pay notwithstanding their noncompliance with the plan. Well, the trustee — the noncompliance was the result of the trustee's agent interference. Yes, under the federal common law — under contract law. It's basically contract law that if you interfere with the fulfillment of a condition precedent, then the fulfillment — the requirement that the condition be satisfied is excused. That would be under the 502A13 remedy of excusing the filing. So if, for example, Mr. Lopez had said something like, don't file the retirement papers because you're better off waiting until after he dies to do that, and we — the trustees and then we decided that they're right and you're wrong, that there is no retroactive ability to file, but if he gave that kind of inaccurate advice about the pension plan that inhibited her from filing the application that would actually be required, then you're saying that would excuse the compliance with the — during the lifetime filing, if indeed that is a requirement. As a remedy for a breach of fiduciary duty, yes. What I'm referring to here is not even reaching the issue of fiduciary responsibility. If this were a simple contract issue, it's the same argument that you're fulfilling — you're interfering with the fulfillment of a filing requirement, and that's — Like if he refused to take it, for example. She said, no, I want to file it, and he said, I can't do that. If he prevented her from physically filing it, that's interference. That's physical interference. This is — what he said — You're saying this is the same because it's — It's psychologically coercive. That's right. No reasonable person could have done anything but. That rests on the fact that he gave her inaccurate information about the welfare fund. That's what's coercive. That's right, but if the — however the coercion happens, if he doesn't give her — this is a misrepresentation by omission. You're saying if a pension fund official, which Lopez is not, but you're saying he has apparent authority to be, if a pension fund official gave misleading advice about the welfare fund that led someone not to fulfill a condition precedent, at least if that misinformation was so coercive that it would prevent a reasonable person from doing it, that's kind of the argument to have that. That's right. That would excuse the filing requirement. Or at least it would enable us to direct them to accept belated filing or something like that? I think that the fact that the inherently — the strength of what he said, the — I'll use the word coercion even though I'm not intending to imply that it's intentional. It didn't have to focus on the welfare fund. It could have been anything that would — Well, the point is it's something that's not about the pension fund. If a pension fund official gave some kind of misleading advice about something — That would induce a — that would make any reasonable person not file it. And what if the plan was clear to the contrary? What if both the SPD and the plan were clear to the contrary that whatever the individual said was incorrect and there could be no doubt that it was incorrect based on a review of the plan of the SPD? Does that affect your analysis? Well, here the coerciveness — it was misrepresentation by omission. Had she had — But I need to understand how your analysis of the effects of this interaction that was — where there was an omission and it was misleading and maybe coercive, whether in the context of a plan document that is clear it matters at all. I mean, doesn't the participant have an obligation to look at the plan? And if the plan says, here's what the rule is, and it's — many plans are very unclear on this, on many counts. But if the plan was very clear, does that change the analysis? Well, I'd like to — at this point, she would — the Keenan letter, because Keenan also fits into this apparent authority principle. Keenan told her, if while actively working you passed away, what has been absent so far from the discussion is that in August, Mr. DeRogatis had been sent home from work. He was too weak to work. He went on disability. The phrase, while actively — he wasn't actively working anymore. The phrase is common in disability insurance policies and health insurance policies with respect to eligibility. It typically provides that people in a covered class will become eligible after 30 days, so long as they are actively working or actively at work at their employer's workplace. And the courts have typically stated that that means you have to be present at the workplace engaged in performing your duties. That's when a reasonable — an average person sees the phrase — had she looked at this letter, when the phrase actively working, he's no longer actively working, because that's where Keenan points out to the sections of the SPD concerning the pre-retirement survivor annuity he's getting. That would not have helped her had she looked at it. When the district court stated that Keenan's letter clearly told her what she should look at, that by August, the facts had changed. In March, there's nothing necessarily improper or misleading about this letter. Mr. DeRogatis was still working. But by August, he'd stopped working. This letter would not have given him appropriate — Mrs. DeRogatis appropriate information as to what section of the SPD to look at. And, in fact, the second page states, if you elect to retire, he had signed the pension application August 2nd. At that point, the common person would think he had elected to retire. The letter did not state, if you have retired, these are the options that you can have. Have retired would connote having gone through the process, the benefit — it's been accepted. The application's been accepted. But when you tell somebody, if you elect to retire, when you sign the application, the ordinary person would think you have elected to retire. And that's where this section points her to the options available. That's why the Keenan letter is not helpful to the trustees with respect to whether or not Mrs. DeRogatis was provided with appropriate information as to where in the SPD to look. Now, Mr. Lee Ross, you've reserved three minutes for rebuttal. Why don't we hear from Ms. Gomez? Thank you. Thank you. Good morning, Your Honors. My name is Lisa Gomez. I'm here as counsel for the Board of Trustees, the defendant appellees of the Central Pension Fund. I'm here with my partner, Michael Adler. As Judge McMahon noted in her decisions below, this is certainly a very sad case, and it presents a very sympathetic set of facts and circumstances. However, as many of you have noted during the course of this argument, trustees of ERISA plans are required to apply the rules of those plans uniformly, and that includes applying them in no matter how compelling or sympathetic or unfortunate the situation may be. This appeal relates to Judge McMahon's determinations, first upholding under a deferential standard of review the trustees of the pension fund's determination with respect to the plaintiff's claim for benefits. The trustees determined, based on the terms of the plan, that when a participant dies and at that time, when the participant passes away, the participant has not yet actually retired, that the spouse of the participant, if the participant was married, is entitled to a joint and survivor annuity and a pre-retirement joint and survivor annuity. 50% level, not 100% unless an election's been made. Yes, if they die before retirement. That was the determination made by the trustees of this fund. The plaintiff had earlier in briefs acknowledged that the deferential standard applied and had not really challenged that determination with respect to the claim for benefits. Am I right in understanding that the pension fund has agreed that Mr. Lopez and Keenan had apparent authority to speak on behalf of the pension fund and to help participants understand the pension fund? No, you're not. In fact, the pension fund disagrees with that. The pension fund did not give these individuals apparent authority to speak on behalf of the pension fund or on behalf of the trustees. The court did not determine that apparent authority was present. The court did not get to that issue. Judge McMahon did not get to that issue because she determined that whatever actions they took were, in fact, ministerial, so she need not get to the apparent authority issue. Wasn't the New York office, though, where the welfare fund was administered the place where people were invited to go with questions? Did the pension fund have a New York office? The pension fund did not have a New York office. The pension fund is a national pension fund that's located in Washington, D.C., but there are locals throughout the country. And while participants are certainly invited to contact the Washington office or to look on the website or to call, stop in if they'd like to, but they are also welcome to pick up just very basic information like copies of an SPD forms, basic pension projections that could be mailed to their home or presented to them. Mr. Keenan's letterhead says the welfare and pension funds, annuity fund, vacation fund, apprenticeship skill improvement and safety fund, and gives the 212 number for welfare and pension funds, and gives advice about the pension fund as well as the welfare benefit. You don't think that creates a sense of apparent authority to speak on behalf of the pension fund? It should not, Your Honor, because, first of all, Local 15 had its own pension fund, and so the letterhead that you're referring to referred to the Local 15 funds, all of the funds that you mentioned, not to the central pension fund of the International Operating Engineers, which is the fund in Washington, D.C. The pension benefits that we're speaking about relate to the central pension fund benefits, not any Local 15 pension fund benefits. And, I mean, it's unfortunate that the welfare fund or that the Local 15 funds didn't update their letterhead, but certainly central pension fund had no knowledge of that. It was referring to a totally different fund. Okay. So with respect to the claim for benefits, we maintain that the trustee's determination was entitled to deference and should not be set aside. With respect to whether apparent authority existed, again, we maintain that Judge McMahon did not reach that point. The central pension fund cannot be held liable for the acts of the employees of a totally different fund, the Local 15 welfare fund, unless they're fiduciaries, which Judge McMahon found that they are not fiduciaries, not with respect to the central pension fund and not even with respect to the welfare fund that they were, in fact, employed by. I don't know that you need to take on that latter question. All you need to establish is that they're not fiduciaries with respect to your fund, regardless of what they might be or what effect it might have that they were on liability of the welfare fund, that they were employees thereof. Certainly, Your Honor. And to that point, with respect to the cases that relate to this issue, where there is an individual that is employed by the fund about which he or she is giving the incorrect information, there have been some cases where the court has found that those employees were, in fact, acting as fiduciaries, depending on what the facts were. With respect to this case, these individuals, Keenan and Lopez, were not only performing ministerial functions, but they were not employees or agents of the central pension fund. And there should have been nothing that Mrs. DeRogatis could reasonably rely upon to take the information that these individuals gave, or that Mr. Lopez gave in particular, relating to her entitlement to welfare fund, or Mr. DeRogatis's, excuse me, entitlement to welfare fund benefits that should affect what the trustees of the pension fund were responsible for, with respect to her pension fund benefits. Did the welfare fund have a fiduciary obligation to provide accurate and clear information about its own plan to Mr. and Mrs. DeRogatis? Did the welfare fund? I can't speak as since I'm not. I mean, I'm sorry, did the pension fund? Oh, yes. Fund confusion. Yes, I mean, sorry. I wanted to make sure I was answering the correct question. Yes, I mean, the trustees of all ERISA plans have a fiduciary duty to make sure that they are clearly explaining to the participants and beneficiaries what their benefits are. There are, from time to time, misstatements that are made, and courts have decided on, depending on the circumstances, whether those misstatements rise to the level of being a fiduciary breach, being an actual misrepresentation, whether the reliance. You don't have to be a trustee making a misstatement in order for there to be a fiduciary breach, right? You have someone who's authorized to act on behalf of the fund who is giving information and fulfilling that fiduciary obligation. Right. You don't need to be a trustee, but it has to be someone who is not only acting on behalf of the trustees, but is also, to the end of your sentence, that they are acting in that fiduciary capacity. Does it need to be someone who is empowered to make discretionary decisions, or is it just someone who is directed to fulfill that fiduciary obligation to provide clear and accurate information? It would have to be someone who is empowered to do more than just a ministerial task. So if you have someone that is merely answering the phone or meeting with participants and saying, here's the plan document. But if their task is, you know, make sure participants understand the plan, you know, answer questions, you study up on the plan and make sure participants understand it and provide that information, aren't they acting as fulfilling the fiduciary obligation of the plan when they do that? I think that it would depend on exactly what the discussion was, but generally if the plan says these are the provisions of the plan and the individual is merely explaining to the participant or the beneficiary what the plan provisions are, what they say, how they apply to that individual, that individual is not exercising any discretion. Doesn't it go back to Becker in a sense? Yes. If the employee is entrusted with doing mathematical calculations, for example, and makes a mistake, that might be one situation. And similarly, if the employee is explaining a provision of the plan that is in fact clear and should be clear to anyone and somehow gets it wrong, that might be a different situation. But if the plan has some ambiguity and this is the person that the, and of course I recognize that in your case this is getting pretty far from the facts, and that person clearly is the one that the trustees told the person to go to to clear up ambiguities, it's a little hard for me to understand whatever the person's training, role, job title, why that person wouldn't be fulfilling the fiduciary responsibilities of the trustee to provide that kind of clarity that hasn't yet been provided. Would you disagree with that as a principle? I don't necessarily disagree with it as a principle. It's difficult to apply that in this case, however, because it's so off from what actually happened here. Certainly there could be a scenario under which an individual who was employed by a fund gave information and that information the participant or the beneficiary reasonably relied upon to their detriment, and the fund could be held liable. But here there are so many what-ifs and different applications that just aren't applying here that I think that that would be going too far off in a different direction. Okay, I think I have about 20 seconds left. I think that means you're 20 seconds over. Oh, I'm 20 seconds over. Do you have any other questions? You can make a closing statement if you'd like. Okay, I don't really have much more to add other than, again, with respect to some of the statements that Mr. Libros stated, this discussion about coerciveness and that Ms. DeRogatis was in a way forced to take action other than she would otherwise have taken, I think that one thing that should be noted is that there was a period of time between that meeting that she had with Mr. Lopez and the time when Mr. DeRogatis passed away, and during that time there was no contact made with the Central Pension Fund at all regarding what she had been told at the Local 15 office. And I think coerciveness, as Your Honor had mentioned previously, is a pretty strong word to be using here. She was dealing with a dying husband who was hospitalized. I understand that, and I don't mean to be disrespectful, certainly, but there were things that could have been done to check if there was so much of a concern that this was such a shocking revelation that was being told. I'm sure that's right. I think Mr. Libros only means to say that the misinformation that was provided was particularly potent. It was not a trivial error. It was something that an outside observer would clearly think would have a powerful impact on the decision-making. Right. And that information was made about a different fund by a different employee. Thank you very much. Anyway, thank you. Thank you. Mr. Libros, you have reserved three minutes for rebuttal. Thank you, Your Honor. Analytically, in the pension fund case, the district court granted summary judgment to the pension fund on the ground that there was no fiduciary function here. I believe that's clearly wrong. Varity points out that fiduciary functions are not limited to providing the documents and disclosures ERISA otherwise requires, and that it includes explaining the meaning of the plan to participants so that they can more readily understand it for the purpose of obtaining benefits in the future. That is a fiduciary function, so the district court is incorrect on that point. This gets us fairly far afield from the facts here, but both Varity and Amara are cases in which companies that are sponsoring retirement plans give what I think are easily interpreted as deliberately misleading information in order to sort of make deleterious plan changes go down easily with workers in ways that could affect their behavior as a class. That's very different as a context anyway. Maybe the same rules should apply, but it's a different context than the sort of retail provision of information about the details of plans that's all in good faith, and it's rather different. Well, with respect to fiduciary – well, of course you're right factually. If you look at the paradigm of – as a professor, you well teach this, that in terms of – you look at status, you look at duty, breach of duty, cause and fact, harm. In this case, we never got past the first stage, status. The district court made no ruling on anything else with respect to the pension fund, and in Varity, the district court – the Supreme Court expressly stated that it was independently reviewing the holding of the district court there that the Varity Corporation had engaged in, quote, discretionary acts, unquote, of, quote, plan administration, and it found that providing more information than ERISA requires to participants in order to enable them to – was a discretionary act of plan – a discretionary act, and because it related to helping participants understand the plan better and to access the plan's benefits, that was plan administration. The next step – it had to say that in order to get to the next step to find a breach of duty, that lying scheme, but you always – but that first step is applicable in any kind of situation where you're talking about representatives of the plan discussing things. In fact, recently, the Sixth Circuit in Deschamps in an apparent authority case that we cited in our brief pointed out that that's exactly what Varity stated, that – and that was not a scheme case. That here in the Bell versus Pfizer case, that case in this court concerned the scope – if you are a fiduciary, that the scope of your duty with respect – pension plan fiduciary Pfizer, its duties with respect to its pension plan did not extend to providing information about the non-ERISA stock plan, and that's why the person lost. The person had dismissed – Bell had dismissed their state law misrepresentation claims against Pfizer for the stock bonus plan misrepresentation for whatever reason, but that was the proper claim in theory in that case. In Bell versus Pfizer, the district judge, Judge Wood, had pointed to Varity in rejecting – in denying the Pfizer corpse motion for summary judgment on fiduciary status by pointing to Varity for that proposition that I've stated. After trial in Bell versus Pfizer, the court found that – a different judge found there wasn't a misrepresentation with respect to the pension plan, only the stock bonus plan, and there was no fiduciary obligation to talk about that. So it's apples and oranges, Bell versus Pfizer and fiduciary status. With fiduciary status except fiduciary as to whom? I think the ultimate problem in Bell was that the information was being given about, in that case, something that wasn't an ERISA plan at all. That's right. But I think the point was just not their ERISA plan. Isn't that really the – That's right. In this case, you can draw a line down the middle of the page. The health plan fiduciary misrepresented the status of the health plan. And if, in fact, Lopez and Keenan had apparent authority, the misrepresentation by omission is with respect to telling someone not to file a pension application for whatever reason, but not telling them that if you don't file it before the man dies, you're going to lose something. And in the record, just one last point. In our brief, we point out that Mr. Lopez testified that Mrs. DeRogatis told him that my husband's in the hospital, very ill, and wants to retire. She testified that she told him he had stage IV lung cancer and wanted to retire. And thank you very much. Thank you very much. Thank you both for your arguments. We'll reserve judgment. May I just say, on my own behalf, and I hope, Ms. Gomez, you'll convey this to Mr. Steinberg as well, this has been just an exemplary oral argument in my view. It's a very complicated case, and all of the attorneys have been both extremely well prepared, extremely candid with the court about what their arguments are and what the facts and their issues were, and I just think it was terrific, and I think I owe it to you to tell you that. Well, we thank you. Thank you very much, Your Honor. Thank you all.